# EXHIBIT A

Trace Number - ED101J016988397

Certified Document Number: 52848615 - Page 1 of 54

Filed 12 July 23 P12:40
Chris Daniel - District Clerk
Harris County
ED101J016988397
By: Sharon Carlton

## 2012-41961 / Court: 151

CAUSE NO. _____

| | | |
|---|---|---|
| South Yorkshire Pensions Authority | § | In the District Court of |
| | § | |
| vs. | § | Harris County, Texas |
| | § | |
| BP PLC, BP America, Inc, BP | § | |
| Exploration & Production, Inc. | § | |
| Anthony B. Haywood and | § | |
| Douglas Suttles | § | _____ Judicial District Court |

### PLAINTIFF'S ORIGINAL PETITION

Plaintiff South Yorkshire Pensions Authority ("Plaintiff") makes the following allegations upon personal knowledge as to its own acts and upon information and belief as to all other matters. Plaintiff's information and belief are based on its counsel's ongoing investigation. The investigation of counsel is predicated upon, among other things, a review of public filings by BP plc ("BP" or the "Company"), and its subsidiaries and affiliates, with the United States Securities and Exchange Commission ("SEC"), including, among other things, reports filed on Forms 6-K and 20-F; press releases and public statements issued by the Company and its subsidiaries and affiliates; media reports about the same entities; publicly available data relating to the prices and trading volumes of BP shares; reports issued by securities analysts who followed BP; and factual allegations in pleadings in related lawsuits, including *In re BP plc Securities Litigation*, No. 4:10-md-02185 (KPE) (S.D. Tex.) ("the Texas Federal Action").

1

## I.    NATURE OF THE ACTION

1.    BP is the third-largest energy company in the world with operations in over 80 countries.  It produces around 3.8 million barrels of oil equivalent per day. BP's largest division is BP America, Inc., which is the largest oil and gas producer in the United States.

2.    This action seeks recovery on behalf of a United Kingdom public pension fund that purchased BP ordinary shares on the London Stock Exchange ("LSE") during the period January 16, 2007 through May 28, 2010 (the "Relevant Period").  Plaintiff lost substantial sums as a result of BP's misleading statements regarding: (i) the Company's "safety first" policies purportedly implemented in 2007 to remedy its previous "profits first" corporate culture (which had led to a series of catastrophic events); (ii) the size of the oil spill following the fatal Deepwater Horizon explosion on April 20, 2010; and (iii) the degree of BP's likely responsibility for the catastrophe once it occurred.

3.    Plaintiff's claims for purchases on the LSE arise under Texas statutory and common law, which unlike U.S. federal securities laws, do not limit claims to transactions in securities "registered on a national exchange."  Such state laws are applicable to these claims because, *inter alia*: (i) Texas has the most meaningful connection with and interests in the parties and the transactions at issue; (ii) BP has a substantial presence in Texas, including the headquarters of several major subsidiaries responsible for operations at Deepwater Horizon; and (iii) many of Defendants' misstatements, including all of those concerning the size of the oil spill, were issued in Texas.

2

Certified Document Number: 52848615 - Page 3 of 54

## II.    THE PARTIES

### A.    Plaintiff

4.    Plaintiff South Yorkshire Pensions Authority, a U.K. public pension fund, is located in South Yorkshire, Great Britain.   Plaintiff is responsible for managing billions of dollars of workers' pension funds.   Plaintiff purchased BP ordinary shares on the LSE during the Relevant Period and was damaged by Defendants' misconduct.

### B.    Defendants

### Corporate Defendants

5.    Defendant BP plc is a United Kingdom corporation with extensive U.S. contacts including: (a) BP is the largest U.S. oil and gas producer; (b) 40 % of BP's assets and workers are in North America; (c) several BP brands and gas stations including, ARCO, BP and Castrol, are sold and located throughout the U. S.; (d) roughly 40% of BP's ordinary shares are owned by U.S. individuals and institutions; and (e) BP files annual reports and other documents with the SEC.   As such, the Company is subject to the informational requirements of the Securities Exchange Act of 1934, and in accordance therewith, files periodic financial statements and other information with the SEC. BP, plc may be served through its registered agent at CT Corporation, 350 North Saint Paul, Dallas, Texas 75201.

6.    Defendant BP America, Inc. ("BP America"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas.   BP America produces oil and natural gas products in the U.S. BP America may be served through its registered agent at 501 Westlake Park Boulevard, Houston, Texas 77079.

3

7.      Defendant BP Exploration & Production, Inc. ("BP E&P"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas. BP Exploration & Production, Inc. may be served through its registered agent at 501 Westlake Park Boulevard, Houston, Texas 77079

8.      Defendants BP America and BP E&P are collectively referred to hereinafter as "Aiding and Abetting Defendants."

9.      Defendants BP, BP America and BP E&P are collectively referred to hereinafter as "BP" or "Corporate Defendants."

### Individual Defendants

10.     Defendant Anthony B. Hayward ("Hayward") served as the Company's Chief Executive Officer ("CEO") from May 2007 until October 2010, and served as an executive director of the Company from 2003 to November 2010.  From 2002 to 2007, Hayward served as the CEO of BP E&P's business segment, which oversaw exploration and drilling in the Gulf of Mexico, among other places.   Defendant Hayward was a member of BP's executive management, and was responsible for the day-to-day running of BP.   During the Relevant Period, Hayward signed certain BP Annual Reports, and made many of the other false and/or misleading statements as alleged herein. Anthony B. Haywood may be served at his place of business 501 Westlake Park Boulevard, Houston, Texas 77079

11.     Defendant Douglas Suttles ("Suttles") served as Chief Operating Officer for BP E&P from January 2009 until at least January 2011.  In January 2007, he was named President of BP Exploration (Alaska) Inc.  During the Relevant Period, Suttles made false and/or misleading statements as alleged herein. Defendant Douglas Suttles may be served at his place of business at 501 Westlake Park Boulevard, Houston, Texas 77079

4

Certified Document Number: 52848615 - Page 4 of 54

12.    Defendants Hayward and Suttles are collectively referred to hereinafter as the "Individual Defendants."

## III.    JURISDICTION AND VENUE

13.    This Court has personal jurisdiction over each Defendant named herein.  Each Defendant is either a corporation that conducts business, and maintains operations in this state, or is an individual who has sufficient minimum contacts with this county, state, or the United States to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  The Individual Defendants, among other things, committed tortious acts within the state.  The Individual Defendants issued false and misleading statements from Texas, including during the aftermath of the April 20 explosion, when Defendant Hayward worked from BP's "crisis center" and issued misleading statements regarding the size and BP's responsibility for the oil spill.

14.    This Court has personal jurisdiction over the Corporate Defendants.

(a)    BP has its principal office in the U.S., and is authorized to do business in Texas.  The Company regularly transacts business in Texas and derives substantial revenue within Texas from its business, such as BP's brands of Castrol and BP's gas stations.  BP's registered agent is CT Corporation, 350 North Saint Paul, Dallas, Texas 75201.

(b)    The headquarters of BP America and BP E&P are located in Texas.  BP America's registered agent is located at 501 Westlake Park Boulevard, Houston, Texas 77079.

Certified Document Number: 52848615 - Page 5 of 54

15.    Venue for the state law claims is proper in this Court because a significant part of the alleged wrongdoing occurred in this county, where defendants have a presence.

## IV.    FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS RELATING TO PLAINTIFF'S CLAIMS

### OVERVIEW

16.    Blame for the Deepwater Horizon disaster lies squarely with BP, whose history and corporate culture consistently placed cutting costs above protecting lives and the environment.  After two major accidents in 2005 and 2006, the Company conducted an extensive internal investigation.  Then, on January 16, 2007 (the beginning of the Relevant Period), the Company announced a series of reforms that purportedly prioritized "safety first" for all operations.  Throughout the Relevant Period, BP consistently touted the Company's commitment to, and implementation of, these safety reforms and insisted that, in the event of an emergency well blowout, BP could contain and adequately address a major spill in the Gulf of Mexico.

17.    For example, in response to an investigation spearheaded by former Secretary of State James Baker which resulted in issuance of a report in 2007 that made ten recommendations concerning "sustainable improvements in process safety performance," the Company represented that it "will implement the recommendations by an independent safety review panel as part of the company's continuing effort to improve its safety culture and to strengthen and standardize process safety management at BP's five U.S. refineries."

6

Certified Document Number: 52848615 - Page 6 of 54

18.     These "safety first" statements were materially false and misleading. BP paid only lip service to such reforms, lacked any tools for dealing with oil disasters such as deep water spills, and continued to operate by sacrificing safety for savings.  Indeed, BP's reform failures led directly to the April 2010 disaster.  As an independent task force investigating the explosion concluded, BP's drilling efforts were "faster and cheaper but not better."

19.     Defendants' misleading of the investors continued in the immediate aftermath of the April 20 explosion.  The Company issued statements intended to assure investors that the leakage was limited and containable, that BP had done nothing wrong, and that consequential damages would be limited.   These statements minimized the decline of BP stock prices, and induced Plaintiff to purchase additional shares.

20.     It was not until Sunday June 1, 2010 that BP revealed that the leakage rate was 300% greater than previously disclosed.  BP shares promptly plummeted, resulting in a 48% loss of value from levels prior to April 20.

**Events Leading Up to the Explosion –
BP's Abysmal Safety Record Prior to 2007**

21.     Even before the latest catastrophe, BP had experienced catastrophes directly attributable to a corporate culture that prioritized profits over safety.  In March 2005, BP's refinery in Texas City exploded, killing 15 workers, injuring 180 others, and causing over $1.5 billion in damages.  A subsequent investigation by the U.S. Chemical Safety Board ("CSB") blamed the disaster on organizational and safety deficiencies at BP, including warning signs that had been ignored for years.

Certified Document Number: 52848615 - Page 7 of 54

Much of the fault was attributed to BP's undue emphasis on cost cutting and profits without regard to safety risks.  The CSB issued a report regarding the Texas City incident and concluded that "the overall safety culture and process safety management... program had serious deficiencies."  In addition, the CSB concluded, among other things, that BP management provided "ineffective leadership and oversight," and "did not effectively evaluate the safety implications of major organizational, personnel, and policy changes."  The Company subsequently pled guilty to federal felony charges and paid a $50 million fine to the Environmental Protection Agency ("EPA") and an additional $87 million fine levied by the Occupational Safety & Health Administration ("OSHA") for "serious systemic safety problems."

22.    After conducting an internal investigation, BP issued a report in which it "accepted responsibility" for the Texas City explosion, and assured investors in a press release on March 23, 2005 that it was working to improve the "safety culture and process safety management at all BP-operated facilities in order to prevent incidents like this in the future."

23.    Despite such assurances, a massive oil spill occurred in 2006 caused by corrosion of BP's pipeline at Alaska's Prudhoe Bay, resulting in massive environmental damage.  The Company had been warned to inspect the pipeline for deterioration as early as 2002, but had failed to do so.  Following the accident, investigators determined that a six mile stretch of the pipeline was severely corroded and in dire need of replacement – clearly something that periodic

8

inspection would have detected. Following the Prudhoe Bay spill, Booz Allen Hamilton found that: (1) BP's management culture was consumed with cost-cutting and meeting financial targets at the expense of safety and maintenance issues, and (2) BP's internal communication culture failed to elevate critical risk data to senior leadership, thereby stymieing corrective action on the safety front.

24.     As a result, BP was charged with criminal violation of the Clean Water Act, to which it pled guilty. In accepting a guilty plea in exchange for three years of probation, the court chastised the Company, saying that it should have spent more money and time on maintenance with a "little less emphasis on profits."

25.     In 2005, at the urging of the CSB, BP established its own independent panel to review and improve its safety procedures chaired by Former U.S. Secretary of State James Baker, III (the "Baker Panel").

26.     (a)     On January 2007, the panel issued a report (the "Baker Report") with findings and ten recommendations regarding the Company's safety culture and procedures. The Baker Report cited organizational problems as the root cause of BP's failure to respond to major incidents and concluded that "BP management had not distinguished between occupational safety … and process safety" and had "not adequately established process safety as a core value."

(b)     The number one recommendation of the Baker Report required BP's corporate management to "demonstrate their commitment to process safety by articulating a clear message on the importance of process safety and matching that message both with the policies they adopt and the actions they take."

Certified Document Number: 52848615 - Page 10 of 54

(c)    The Baker Report also recommended adoption of a "Code of Conduct" for BP, whose core mantra was to "stop any work that becomes unsafe." The proposed Code also called for the mitigation of identified risks to a level "as low as reasonably practicable," and the formulation of emergency response plans.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS
### The January 16, 2007 Statement

27.    After the release of the Baker Report on January 16, 2007, BP issued a press release in response to the Report where the Company noted that the Report "made recommendations for improving BP's process safety leadership, systems, expertise and oversight of process safety performance."   More importantly, BP represented in the press release that it "will implement the recommendations made by an independent safety review panel as part of the company's continuing effort to improve its safety culture and to strengthen and standardize process safety management at BP's five U.S. refineries."

28.    The foregoing statement was materially false and misleading when made.  Defendants falsely represented that BP would be placing process safety at the foundation of BP's operations and that BP was going to implement the recommendations by the Baker Panel to improve process safety, when, in fact, BP was instead expanding its deepwater drilling operations without implementing adequate process safety procedures for well testing in deep sea drilling or creating protocols for identifying when warning signs arose, and responding to warning signs when they arose, so as to avert a disaster.

10

29.     Defendants also falsely represented that BP was "continuing efforts to improve its safety culture and to strengthen and standardize process safety management at BP's five U.S. refineries", when, in fact, BP's Operational Management System ("OMS") failed to require uniform process safety policies and procedures that would have eliminated or reduced the risk of deepwater drilling and prevented the blowout at the Macondo well.

**The November 8, 2007 Statements**

30.     On November 8, 2007, Defendant Hayward spoke at the Houston Forum about BP's supposed commitment to process safety and about the Company's ability to successfully operate at the industry's "frontiers," which included the Gulf of Mexico.  During his presentation, Defendant Hayward stated, in part, as follows:

> We continue to implement the roadmap provided to ourselves and the industry by the excellent work of the Baker Panel. *BP remains absolutely committed to taking these lessons and becoming a world leader in process safety.*

31.     The foregoing statements were each materially false and misleading when made for the following reasons, among others:

(a)     Defendant Hayward misrepresented BP's absolute commitment to process safety when, in fact, BP was not so committed and was instead expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the possibility of catastrophic failure, thereby increasing the Company's exposure to risk;

Certified Document Number: 5284865 - Page 11 of 54

11

Certified Document Number: 5284615 - Page 12 of 54

(b)      Defendant Hayward misrepresented the true risks associated with deepwater drilling in that he failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations;

(c)      Defendant Hayward misrepresented that BP maintained sufficiently advanced safety practices for use in frontier regions such as deepwater; and

(d)      Defendant Hayward misled investors with regard to BP's OMS, its safety program, as OMS permitted BP to meet only minimal local requirements rather than industry best practices, and was unsuited to deepwater drilling.

**The February 22, 2008 Statements**

32.      On February 22, 2008, BP released its 2007 Annual Review, which emphasized that the Company remained committed to process safety.  Indeed, the strength of the safety message and level of priority given to it was reflected by the report's cover page, which stated:

> Our key priorities
> Safety
> People
> Performance

33.      The 2007 Annual Review also contained statements related to safety and risk management:

> ***In safety, we are significantly lowering the risk profile of our operations****.* We are working hard to ensure that we have the right people with the right skills in the right places. And we are addressing performance by reducing organizational complexity, ***improving operational consistency*** and changing individual behaviours. On the front lines of our business, we are moving this agenda forward.

> ***

12

Process safety

Throughout 2007, *BP continued to progress the process safety enhancement programme* initiated in response to the March 2005 incident at the Texas City refinery. *We have made progress across the group on all the recommendations*:

• Leadership – *We have consistently communicated that safe and reliable operations are our highest priority*. Our safety and operations audit group was strengthened and completed 28 audits in 2007.

• *Management systems – Implementation of our operating management system began at an initial group of sites, which included all five US refineries.*

• Knowledge and expertise – We established an executive-level training programme, ran process safety workshops and launched an operations academy for site-based staff *to enhance process safety capability*. Specialists have been deployed at our US refineries to accelerate priority improvement programmes.

• Culture – To reinforce the need for a stronger safety culture, we undertook in-house assessments of BP's safety culture, supported by communication from leadership.

• Indicators – Progress has been made in developing leading and lagging indicators, building on metrics already reported to executive management. We are working with the industry to develop indicators and this already includes progress to agree on a metric covering loss of primary containment.

34.    The 2007 Annual Review contained the "Group chief executive's review," signed by Defendant Hayward. In his Executive Review, Defendant Hayward assured investors that, under his leadership, safety was BP's top priority. For example, Defendant Hayward stated, in part, as follows: "[w]hen I took over as group chief executive, the immediate task was to restore the integrity and the efficiency of BP's operations.   I set out three priorities: safety, people and performance." Defendant Hayward further explained that BP's new OMS brings

13

"greater consistency to [BP's] operations" regardless of where those operations were occurring.

35.   The foregoing statements were each materially false and misleading when made for the following reasons, among others:

(a)   Defendants falsely portrayed BP's operations as having a lower "risk profile" when, in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the possibility of catastrophic failure, thereby increasing the Company's exposure to risk;

(b)   Defendants misrepresented the true risks associated with deepwater drilling in that they failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations rendering their statements materially false and misleading;

(c)   Defendants falsely represented that BP's OMS was "improving operational consistency" when, in fact, BP set differing safety practices country-by-country in order to save time and money; and

(d)   Defendants misrepresented BP's professed commitment to safety as they failed to disclose that BP was implementing safety budget cuts and staff reductions that impacted the Company's ability to safely drill in the Gulf of Mexico.

**The February 27, 2008 Statements**

36.   On February 27, 2008, BP conducted its 2008 Strategy Presentation during a conference call with investors and analysts.   There, BP executives

14

Certified Document Number: 5284861 5 - Page 14 of 54

including Defendant Hayward asserted that safety was BP's top priority and claimed that the Company was able to deliver strong performance while maintaining safe operations.  More specifically, Defendant Hayward stated, in part, as follows:

> ***2007 saw further improvement in our overall safety performance***. Over the last eight years, our safety performance, measured by Recordable Injury Frequency Rate, the standard measure of safety in our industry, has improved three-fold. As you can see on this chart, our performance is amongst the best in our industry.
>
> Notwithstanding this track record, ***our intense focus on process safety continues***. We are making good progress in addressing the recommendations of the Baker Panel and ***have begun to implement a new Operating Management System across all of BP's operations***. Integrity-related incidents have fallen significantly over the last three years, and oil spills of more than one barrel continue a strong downward trend.
>
> ***Safe and reliable operations remain our number one priority.***
>
> ***
>
> ***We are taking action to close the competitive gap through a focused effort on three priorities of safety, people and performance. We are determined to operate safely and reliably, to develop the capability of our people and to drive performance through restoring operational momentum. At the same time we are rigorously reducing complexity and cost. In Exploration and Production, we continue to see the benefits of our strategy***. Our resource base, even as it stands today, underpins the potential to sustain production of at least four million barrels a day out to 2020. We will do better than this as we continue to pursue new access and deliver further exploration success.

37.     The foregoing statements were each materially false and misleading when made for the following reasons, among others:

(a)     Defendants falsely portrayed that BP's "intense focus on process safety continues" and that "[o]ur top priority continues to be the safety and

15

reliability of our operations" when, in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the possibility of catastrophic failure, thereby increasing the Company's exposure to risk;

(b)    Defendants misrepresented the true risks associated with deepwater drilling as they failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations and BP's failure to adequately address those risks through its failure to implement proper and adequate safety procedures;

(c)    Defendants misrepresented BP's OMS as BP was using differing safety practices country-by-country in order to save time and money; and

(d)    Defendants misrepresented BP's professed commitment to safety in that they failed to disclose that BP was implementing safety budget cuts and staff reductions that impacted the Company's ability to safely drill in the Gulf of Mexico.

### The April 17, 2008 Statements

38.    On April 17, 2008, Defendant Hayward delivered a speech at the Company's 2008 Annual General Meeting where he insisted that safety was of the utmost importance at BP and distinguished BP from other oil companies based on the safety of its deepwater operations. In particular, Defendant Hayward stated, in part, as follows:

> When I took over as chief executive last May, I said that we would focus on three basic priorities: safety, people, and performance.

Certified Document Number: 52848615 - Page 16 of 54

Everyone at BP understands those priorities. And while I am in this role they will remain the priorities.

*Safety is our number one priority and in 2007 our overall safety record continued to improve.* Over the last eight years *our safety performance according to the standard industry measure has improved threefold and is now among the best in our industry.*

*Our intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations. This is aimed at ensuring that our operations across the world look and feel the same everywhere - and perform to the same high standard.*

\*\*\*

International oil companies have always operated on the frontiers of the industry. *And that is where BP is happiest, doing the tough stuff that others cannot or choose not to do.* From our roots in those Edwardian days when the company was formed, prospecting for oil among the dunes of Persia - it is the same frontier spirit that is evident today as we develop the deepwaters of Angola, the Gulf of Mexico and Egypt[.] . . .

Today, we continue to push technological frontiers, exploiting tight gas, increasing reserves through enhanced oil recovery techniques, developing advanced seismic imaging techniques and pioneering research into the next generation of biofuels - which will be based on more efficient molecules and will not be derived from food crops. . . .

So - the frontier is where our role is. *It is by pushing the energy frontier, by moving into new markets and new geographies and by applying our know-how and new technology, that BP has for almost one hundred years generated its returns.*

39.     The foregoing statements were each materially false and misleading when made for the following reasons, among others:

        (a)     Defendants misrepresented the true risks associated with deepwater drilling in that they failed to disclose the multiple safety failures and

17

near-failures that BP had experienced in its deepwater drilling operations rendering their statements materially false and misleading;

(b)     Defendants misrepresented that BP's OMS was "aimed at ensuring that our operations across the world look and feel the same everywhere – and perform to the same high standard," as, in fact, BP was using differing safety practices country-by-country in order to save time and money;

(c)     Defendants misrepresented BP's professed commitment to safety in that they failed to disclose that BP was implementing safety budget cuts and staff reductions which impacted the Company's ability to safely drill in the Gulf of Mexico; and

(d)     Defendants falsely represented that BP's safety performance was "among the best in our industry" when, in fact, BP's (i) focus on high-risk deepwater operations, (ii) failure to adopt adequate operational protocols and safety measures and (iii) failure to implement industry best practices increased its potential liabilities well beyond those of its competitors.

**The December 17, 2008 Statements**

40.     On December 17, 2008, Defendant Hayward gave a speech at the HRH Prince Of Wales's 3rd Annual Accounting for Sustainability Forum where he claimed that BP was continuing to improve its process safety practices.   More specifically, Defendant Hayward stated, in part, as follows:

> BP had a number of high-profile safety lapses in recent years, notably at our Texas City refinery, where there was tragic and unacceptable loss of life.

18

These lapses exposed shortcomings - but they also gave us a huge opportunity to learn and improve the way we operate. We opened ourselves up to scrutiny - and *we listened more to our front-line operations people* - who, of course, really know what is going on on the ground. *And we have continuously reported progress against a response plan and against an independent external report.*

One of the many consequences for us has been to develop and to *embed a new Operating Management System right across BP - and we operate in 100 countries - so that is no mean feat.*

The critical aspect of this system is that it actually translates words into action*. It starts out as a set of requirements which are the platform for safe, reliable, responsible operating activities. And then we continuously improve what we do, every day, every month, every year - in pursuit of sustainable operating excellence.* Importantly, it is developed, implemented and sustained locally in our operating businesses - and makes our leaders locally fully-accountable for what they do.

41.    The foregoing statements were each materially false and misleading when made for the following reasons, among others:

(a)    An internal BP strategy document issued in December 2008 warned BP executives of "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents, and therefore increased the likelihood and severity of "process-safety related incidents;"

(b)    Defendant Hayward misrepresented that BP did not tolerate any retaliation against workers who raised safety concerns when, in fact, BP engaged in a pattern of systematic retaliation against workers who reported safety violations;

(c)    Defendant Hayward misrepresented BP's OMS as using differing safety practices country-by-country in order to save time and money; and

Certified Document Number: 5284 8615 - Page 19 of 54

(d)     Defendant Hayward misrepresented BP's professed commitment to safety in that he failed to disclose that BP was implementing safety budget cuts and staff reductions which impacted BP's ability to safely drill in the Gulf of Mexico.

### The March 10, 2009 Statements

42.     On March 10, 2009, BP's initial exploration plan ("IEP"), which discussed BP's purported safety protocol for the Mississippi Canyon Block 252 – the site of the Macondo well, was "deemed submitted" by the U.S. Department of the Interior Minerals Management Services ("MMS").   The document was initially received by the MMS on February 23, 2009 and was available to the public and BP's investors no later than March 10, 2009.  The IEP estimated the worst case scenario at approximately 162,000 barrels of oil per day and stated that BP "has the capability to respond to the appropriate worst-case scenario included in its regional OSRP."  The document falsely stated, in part, that:

> *I hereby certify that BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge*, or a substantial threat of such discharge, resulting from the activities proposed in our Exploration Plan.

> ***

> An accidental oil spill that might occur as a result of the proposed operation in Mississippi Canyon Block 252 has the potential to cause some detrimental effects to fisheries. However, it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities. *If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sublethal* and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds. No adverse activities to fisheries are anticipated as a result of the proposed activities.

Certified Document Number: 52848615 - Page 20 of 54

***

*In the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses, implementation of BP's Regional Oil Spill Response Plan which address available equipment and personnel, techniques for containment and recovery and removal of the oil spill.*

43.   In addition, the IEP stated that:

An accidental oil spill from the proposed activities could cause impacts to beaches. However, *due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected*. Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIA/EA MMS 2002-052 indicate *there is little risk of contact or impact to the coastline and associated environmental resources.*

44.   The foregoing statements were each materially false and misleading when made for the following reasons, among others:

(a)   As explained by a group of eight U.S. Senators in a May 17, 2010 letter to U. S. Attorney General Eric Holder, there was no "proven equipment and technology" to respond to the spill. The Senators wrote that "[m]uch of the response and implementation of spill control technologies appears to be taking place on an ad hoc basis."  Indeed, BP acknowledged on May 10, 2010 that: "*[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before.*"

(b)   BP falsely represented that the IEP was based on an analysis of the Mississippi Canyon Block 252 site when, in fact, the IEP was boilerplate

21

Certified Document Number: 5284861 5 - Page 21 of 54

language copied from one or more exploration plans that MMS had previously approved for other distinct drilling sites;

(c)    BP misrepresented that BP was prepared to stop a blowout at Mississippi Canyon Block 252 or contain the resulting oil spill when, in fact, BP was wholly unprepared; and

(d)    BP misrepresented that an oil spill would not adversely impact beaches, wetlands, and other environmentally sensitive areas.

**The April 16, 2009 Statements**

45.    On April 16, 2009, Defendant Hayward spoke at the 2009 Annual General Meeting, in which he falsely stated, in part, that: "[o]ur number one priority of safe and reliable operations has been vital to the underpinning of our restored competitive performance."

46.    The foregoing statement was materially false and misleading when made for the following reasons, among others:

(a)    Defendant Hayward falsely portrayed BP's focus as on "safe, reliable operations" when in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the possibility of catastrophic failure, thereby increasing the Company's exposure to risk;

(b)    An internal BP strategy document issued in December 2008 warned BP executives of "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents";

22

(c)     Defendant Hayward misrepresented the true risks associated with deepwater drilling in that they failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations rendering his statements materially false and misleading;

(d)     Defendant Hayward misrepresented the OMS as BP was, in fact, using differing safety practices country-by-country in order to save time and money; and

(e)     Defendant Hayward misrepresented BP's commitment to safety in that he failed to disclose that BP was implementing safety budget cuts and staff reductions that impacted BP's ability to safely drill in the Gulf of Mexico rendering his statements materially false and misleading.

**The June 30, 2009 Statements**

47.     On June 30, 2009, BP publicly filed its revised oil spill response plan for the Gulf of Mexico – entitled "Regional Oil Spill Response Plan – Gulf of Mexico" ("Regional OSRP"). According to BP's Regional OSRP, the *"TOTAL WORST CASE DISCHARGE" scenarios in the Gulf of Mexico ranged from a release of 28,033 barrels of oil per day to 250,000 barrels of oil per day*.   More specifically, BP's Regional OSRP stated: (i) an oil spill occurring less than ten miles from the shoreline could create a worst case discharge of 28,033 barrels of oil per day; (ii) an oil spill that occurred greater than ten miles from the shoreline could create a worst case discharge of 177,400 barrels of oil per day; and (iii) an oil spill caused by a mobile drilling rig that is drilling an exploratory well could create a worst case discharge of 250,000 barrels of oil per day.   BP's Regional OSRP

23

Certified Document Number: 52848615 - Page 23 of 54

explicitly states that the Company and its subcontractors **_could recover approximately 491,721 barrels of oil per day_** (or more than 20.6 million gallons) in the event of an oil spill in the Gulf of Mexico. The Company further claimed and provided certified statements to the MMS that BP and its subcontractors "**_maintain the necessary spill containment and recovery equipment to respond effectively to spills_**."

48.     The foregoing statement that BP and its subcontractors "maintain the necessary spill containment and recovery equipment to respond effectively to spills" was materially false and misleading when made for the following reasons, among others:

(a)     BP's Oil Spill Response Plan contained numerous errors, gross deficiencies and were wholly inadequate to respond to a deepwater oil spill; and

(b)     Defendant Hayward subsequently confirmed that the Company had failed to draw up sufficient emergency response plans, admitting that during the spill "**_we were making it up day to day_**" (November 9, 2010 interview with the BBC). In addition, Defendant Suttles likewise subsequently admitted that BP failed to have an oil spill response plan with "proven equipment and technology" in place that could contain the oil spill.

**The March 5, 2010 Statements**

49.     On March 5, 2010, BP filed its 2009 Annual Report with the SEC on Form 20-F, which was signed by, among others, Defendant Hayward. In the report, BP continued to tout its position as the largest producer in deepwater Gulf of

24

Certified Document Number: 52848615 - Page 24 of 54

Mexico operations while delivering safety in its operations.  In addition, the Form 20-F falsely stated, in part, that:

> *The priorities that drove our success in 2009 – safety, people and performance – remain the foundation of our agenda* as we build on our momentum and work to further enhance our competitive position. . . . To meet growing world demand, BP is committed to exploring, developing and producing more fossil fuel resources; manufacturing, processing and delivering better and more advanced products; and enabling the transition to a lower-carbon future. *We aim to do this while operating safely, reliably and in compliance with the law. . . .*

> Our intention is to generate and sustain business momentum and growth through a rigorous process of continuous improvement and an *ongoing focus on safety, people and performance. . . .*

> Safe, reliable and compliant operations remain the group's first priority. A key enabler for this is the *BP operating management system (OMS), which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency.*

> ***

> *In Exploration and Production, safety, both personal and process, remains our highest priority. . .*

> *BP's operating management system (OMS) provides us with a systematic framework for safe, reliable and efficient operations.* Throughout 2009, OMS helped us to deliver continuous improvement in the way we manage our people, processes, plant and performance.

> From onshore production facilities to offshore platforms, a total of 47 exploration and production sites had completed their transition to OMS by the end of 2009. The remaining seven sites are on track to transition to OMS in 2010.

> ***

> *Our priorities [for Exploration and Production] remain the same — safety, people and performance, focusing on the delivery of safe, reliable and efficient operations.*

Certified Document Number: 52848615 - Page 25 of 54

In 2010, we aim to use the momentum generated in 2009 to continue to improve operational, cost and capital efficiency, while ensuring we maintain our *priorities of safe, reliable and efficient operations*.

\*\*\*

Deepwater Gulf of Mexico is our largest area of growth in the US. In addition, we are the largest producer and acreage holder in the region.

\*\*\*

*Safety, people and performance are BP's top priorities. We constantly seek to improve our safety performance through the procedures, processes and training programmes that we implement in pursuit of our goal of 'no accidents, no harm to people and no damage to the environment'.*

\*\*\*

*In 2009, BP's safety record continued to improve* . . . .

This performance follows several years of intense focus on training and procedures across BP. *BP's operating management system (OMS), which provides a single operating framework for all BP operations*, is a key part of continuing to drive a rigorous approach to safe operations. 2009 marked an important year in the continuing implementation of OMS.

\*\*\*

Taking a systematic approach is integral to improving safety and operating performance in every BP site. Our OMS covers all areas from process safety, to personal health, to environmental performance. *By applying consistent principles and processes across the BP group's operations, the system provides for an integrated and consistent way of working*. These principles and processes are designed to simplify the organization, improve productivity, enable consistent execution and focus BP on performance.

\*\*\*

*We continue to strengthen our processes for managing compliance with environmental regulations* in each of the countries in which we operate. In addition, each employee is required to comply with the health, safety and environmental requirements of the BP code of conduct. We expect our partners, suppliers and

26

Certified Document Number: 5284861 5 - Page 26 of 54

contractors to comply with legal requirements and operate consistently with the principles of our code of conduct.

***

In the US, former US district court judge Stanley Sporkin acts as an ombudsperson. ***Employees and contractors can contact him confidentially to report any suspected breach of compliance, ethics or the code of conduct, including safety concerns***.

***We take steps to identify and correct areas of non-compliance*** and take disciplinary action where appropriate.

***

Following the tragic incident at the Texas City refinery in 2005 the [Safety, Ethics, and Environment Assurance] committee has observed a number of key developments, including: the establishment of a safety & operations (S&O) function with the highest calibre of staff; ***development of a group-wide operating management system (OMS) which is being progressively adopted by all operating sites***; ***the establishment of training programmes in conjunction with MIT that are teaching project management and operational excellence***; ***the dissemination of standard engineering practices throughout the group***; and the formation of a highly experienced S&O audit team formed to assess the safety and efficiency of operations and recommend improvements. ***Throughout this time the group chief executive has made safety the number one priority.***

50.    The foregoing statements were each materially false and misleading when made for the following reasons, among others:

(a)    Defendants falsely portrayed BP's commitment to process and personal safety and that OMS provided BP with a framework for safe, consistent and reliable operations, when, in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures to reduce the possibility of catastrophic failure thereby increasing the Company's exposure to risk;

27

Certified Document Number: 52848615 - Page 27 of 54

Certified Document Number: 52848615 - Page 28 of 54

(b)     Defendants misrepresented BP's true risks associated with deepwater drilling in that they failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations as well as BP's audit of the Deepwater Horizon, which found equipment failures serious enough to lead to personal injury and environmental damage, thereby rendering their statements materially false and misleading;

(c)     An internal BP strategy document issued in December 2008 warned BP executives of "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents";

(d)     Defendants falsely represented that OMS applied "consistent principles and processes across the BP group's operations" when, in fact, OMS allowed BP to use differing safety practices country-by-country in order to save time and money;

(e)     Defendants misrepresented BP's commitment to safety as they failed to disclose that BP had implemented safety budget cuts and staff reductions that negatively impacted the Company's ability to safely drill in the Gulf of Mexico;

(f)     Defendants misrepresented BP's risk profile and its risks from its deepwater Gulf of Mexico operations relative to its competitors, who typically operated at lower depths and had more robust safety programs; and

(g)     Defendants falsely represented that BP was committed to complying with environmental regulations.  In fact, BP's contingency plans to deal

with an oil spill in the Gulf of Mexico (including the environmental impacts of such a spill) contained numerous errors and gross deficiencies, leading to the *ad hoc* implementation of untested measures, such as the unprecedented use of chemical dispersants contrary to direct orders from the EPA.

### The March 23, 2010 Statements

51.    On March 23, 2010, Defendant Hayward delivered a speech at the Peterson Institute for International Economics in Washington, D.C. in which he discussed BP's changes to its safety program following the Texas City, Texas refinery explosion.  During the presentation, Defendant Hayward falsely stated, in part, that:

> Five years ago on this day, fifteen people died and many more were injured, when an explosion tore through our Texas City refinery.
>
> *That tragic accident has changed in a profound and fundamental way our approach to safety and operations integrity - providing a safe working environment is a paramount responsibility, and our first and foremost priority.*

52.    The foregoing statements were each materially false and misleading when made for the following reasons, among others:

(a)    Defendant Hayward falsely portrayed BP's operations as safe when, in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the possibility of catastrophic failure, thereby increasing the Company's exposure to risk;

Certified Document Number: 5284861⁵ - Page 29 of 54

(b)     Defendant Hayward misrepresented the OMS in that BP was, in fact, using differing safety practices country-by-country in order to save time and money;

(c)     Defendant Hayward falsely represented that BP's "paramount responsibility" and its "first and foremost priority" was providing a safe work environment when, in fact, BP's lack of operational and safety protocols routinely resulted in decisions that sacrificed safety in order to save time and money; and

(d)     Defendant Hayward misrepresented BP's commitment to safety in that he failed to disclose that BP had implemented safety budget cuts and staff reductions that negatively impacted the Company's ability to safely drill in the Gulf of Mexico.

### Additional Facts Regarding the Misleading Nature of the Pre-April 20 Statements
### <u>Safety was Secondary at BP and the Deepwater Horizon</u>

53.     The foregoing statements were lies.  BP's practice of compromising safety for savings continued unabated after the issuance of the Baker Report. Indicative thereof, according to the Center for Public Integrity ("CPI") in an article published by *The New York Times* ("NY Times") on June 19, 2010, between 2007 and 2010, OSHA cited BP for 760 "egregious willful" refinery safety violations. According to an article by the NY Times on July 12, 2010, many of these violations were recorded at the same Texas City facility that had exploded in 2005, and were attributed by OSHA to BP's failure to fulfill the terms of its settlement.  Likewise, between 2006 and 2010, BP received at least one-hundred non-public citations for

Certified Document Number: 52848615 - Page 30 of 54

safety or environmental violations related to exploration or production rigs, pipeline or storage systems, or other facilities.   In October 2007, Defendant Hayward announced plans to reorganize BP to accomplish "increased efficiencies, but failed to disclose that the so-called "reorganization" – which resulted in numerous layoffs and cuts to safety budgets – would materially affect the Company's ability to drill safely in the Gulf of Mexico.

54.   On June 10, 2010, *the Associated Press* published an article detailing the "glaring errors and omissions in BP's oil spill response plans."  The article, among other things, noted that the BP's Regional OSRP "vastly understate[d] the dangers posed by an uncontrolled leak and vastly overstate[d] the company's preparedness to deal with one."

55.   On January 24, 2011, a *Fortune* magazine article revealed a previously unreleased internal BP strategy document dated December 2008 that specifically warned BP executives of serious process safety "gaps" in the Gulf of Mexico.

> It's become apparent that process-safety major hazards and risks are not fully understood by engineering or line operating personnel. Insufficient awareness is leading to missed signals that precede incidents and response after incidents, both of which increase the potential for and severity of process-safety related incidents.

**The Deepwater Horizon Drilling Platform and the Macondo Well:**
**Cost Overruns Lead to Corporate Decisions Ignoring Safety Risks**

56.   BP's exploration efforts at the Macondo well site utilized the Deepwater Horizon drilling platform leased from Transocean Ltd., with Halliburton Corp. personnel performing subcontracting tasks.   However, supervision of the entire exploration effort remained BP's responsibility as certified in its IEP.

31

57.     The exploration drilling phase of the Macondo well was completed in early 2010. Although it was successful, it was substantially over budget. A phase that was supposed to have taken only three weeks actually took six. This resulted in higher leasing costs, as well as penalties, since the rig was scheduled to go to another site. Other problems that arose during the phase resulted in additional costs to BP of over $25 million.

58.     These problems set the stage for a fateful decision. BP decided to cut safety corners at the Macondo well in order to save further expenses and speed the sealing of the well for oil production. Such haste only heightened risks inherent in drilling platform used at site. All exploration rigs are equipped with a "blowout prevention device" ("BOP") called a "blind shear ram," which is designed to cut through pipe below the surface and trap any escaping gas. It is the "failsafe" mechanism, i.e., the last barrier to an explosion. Starting in 2002, all new exploration rigs built for Transocean were equipped with two blind shear rams. This redundancy was designed to address industry studies that raised concerns regarding the reliability of the blind shear rams, particularly if hydraulic fluid leaked. Further, in July 2001, the government agency that regulated offshore drilling recommended that companies install two blind shear arms in deep water drilling rigs because of the significant risk that one might fail.

59.     In 2006, BP began to implement its OMS, touting it as a "single framework" of standards across BP's operations, which would result in "continuous improvement" of safety practices. In April 2008, Defendant Hayward said that

Certified Document Number: 52848615 - Page 32 of 54

OMS was aimed at "ensuring that our operations *across the world look and feel the same everywhere – and perform to the same high standard*."

60.     On the contrary, as revealed in testimony throughout the latter half of 2010 and the report by the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling ("Presidential Commission Report"), BP's OMS did *not* provide a "single" or "common" framework for BP's safety operations throughout the world.   Instead, as noted above, it allowed BP to use differing safety practices country-by-country and to meet only the minimal requirements set by local regulations.

61.     With respect to offshore operations, applicable rules for drilling protocols are more rigorous in certain jurisdictions, such as Norway, Canada, and the United Kingdom, than in the Gulf of Mexico.  For instance, rules exist in other jurisdictions to the effect that "two barriers" must always be maintained on top of hydrocarbons during well completion, that wells in temporary abandonment never be left "underbalanced," and that BOPs always be equipped with two blind shear rams and emergency acoustical switches.  BP followed such higher standards for wells drilled in the jurisdictions that required heightened safety measures.   In contrast, in the U.S. BP took advantage of a lower level of regulation in the Gulf of Mexico.

62.     In this way, BP's OMS operated in stark contrast to Shell's safety program. Shell's "Safety Case" methodology dictated that Shell personnel not merely follow regulations but specifically make out a satisfactory "case" for the

Certified Document Number: 52848615 - Page 33 of 54

safety of a particular operation and the mitigation of risk; Shell's Safety Case also required the company to perform the same mandatory drilling practices around the world, whether demanded by regulations or not. Unlike Shell's program, BP's OMS failed to set consistent safety standards across BP's operations although Defendants represented to investors that BP adopted consistent practices throughout its world-wide operations.

63.     Further indicative of BP's lax safety with the Deepwater Horizon rig, in late 2004, BP contracted with Transocean to replace one of the blind shear rams on the Deepwater Horizon's BOP with a test ram in order to speed-up testing and move to production more quickly.  The installation of this test ram, however, lowered the unit's reliability and reduced the safety redundancies on the rig. Indeed, an agreement between BP and Transocean executed in October 2004 noted BP's awareness of the fact that the removal of the second ram would "reduce the built-in redundancy" of the BOP and raise the rig's "risk profile."

64.     There was also a second, less costly back-up option available to BP. For $500,000, it could have purchased a blowout prevention device that could have been remotely activated by an acoustic signal.  This type of back-up is a standard feature used by other offshore oil exploration companies such as Shell Oil. Moreover, Brazil and Norway mandated the inclusion of this second device on exploration platforms in its offshore waters.

## Problems with the Deepwater Horizon Blind Shear Ram

65.     The inherent risk in the lack of redundancy for the BOP at the Deepwater Horizon rig should have been all the more apparent to BP when it was

34

informed -- prior to the explosion -- that chunks of the BOP's annular preventer had broken off causing a leak in the hydraulic system controlling the device.   This suggested that there were severe operational problems with the BOP. Indeed, ROV operator Tyrone Benton ("Benton") testified before the Joint Investigation team on July 23, 2010 that he had discovered a leak in the Deepwater Horizon's BOP sometime between "February 24 and March 13[, 2010]."  After discovering the leak, Benton informed representatives of both BP and Transocean of the serious problem. As reported by The Guardian on June 21, 2010:  "Benton says that he spotted a leak on the rig's Blowout Preventer . . . . He told the BBC's Panorama programme that both BP and Transocean, who owned the rig, were informed of the leak, and the faulty part – a control pod – was switched off rather than being repaired."

66.    Ronald Sepulvado ("Sepulvado"), a BP employee overseeing the rig's operation, reported the problem to BP officials in Houston prior to the explosion.  At the time, Sepulvado knew that an April audit had determined that this device was long overdue for a major inspection.  Federal regulations require that drilling cease if either of a BOP's two control systems do not work properly.  Nonetheless, not only did BP decide to continue drilling; it failed to report this information (as required) to the MMS.

### The Equipment Flaws Were Compounded by BP's Unsafe Cost Cutting Decisions Made During the Sealing Process

67.    Despite all these red flags, during the sealing phase, BP officials on the Deepwater Horizon made decisions that can only be explained by a desire to save

Certified Document Number: 52848615 - Page 35 of 54

money and avoid further overages, even at the risk of a major accident.  Among other things:

- One day before the explosion, BP decided to utilize a "full string casing" for the last installment of pipe, overruling recommendations by BP engineers that a less risky "liner" be used (which would serve as a barrier if the cement seal failed).  BP decided to forego the liner option because it would have cost $7-$10 million more, and have taken longer.

- BP officials insisted that drilling mud be replaced with seawater to speed up the sealing process even though this increased the risk of gas seepage.  In so doing, these officials overruled the recommendation of Halliburton's engineers.

- BP used only six "centralizers" to avoid "veering off" during the cementing process, despite Halliburton's recommendation that 21 centralizers be utilized.

- Even though BP engineers questioned whether the cementing operation could be successful as planned, BP instructed the subcontractor *not* to perform a critical "bonding test" after Halliburton poured the cement to ensure that the hole was properly sealed.  Such a test would have cost only $128,000.

- The risks inherent in a flawed cement job were known to BP. The Company had experienced a blowout from a well in Azerbaijan in September 2008 that BP acknowledged in reports filed with U.S. government agencies was likely due to "bad cement jobs."

### BP's Conduct Violated Industry Standards

68.    BP's sealing of the Macondo well was a clear breach of the prevailing standard of care.  As noted in the preliminary findings of the "Deepwater Horizon Study Group" issued on July 15, 2010 by the Center for Catastrophic Risk Management at the University of California, Berkeley:

> To date compelling indicators have been surfaced to suggest that: 1) BP's drilling and well completion operations did not meet industry standards, 2) operations were "Faster" and "Cheaper," but not "Better" – the operation records point to excessive economic and schedule pressures resulting in compromises in the Quality and Reliability of the Macondo deep water oil and gas development system, and, thus ignoring risks

Certified Document Number: 52848615 - Page 36 of 54

and potential consequences, 3) the involved parties did not anticipate a blowout and, accordingly, did not develop effective, collaborative and constructive interactions to ensure that the resources needed in case of a blowout would be available.

69.     These findings were echoed by others in the field.  On June 15, 2010, Rex Tillerson ("Tillerson"), the CEO of ExxonMobil, testified before the Congressional Subcommittee on Energy and Environment of the House Committee on Energy and Commerce.  Tillerson commented that the BP incident "represents a dramatic departure from the industry norm in deep water drilling."  Tillerson said that ExxonMobil "would not have drilled the well the way they did" (citing in particular the well design, cement mixture and testing procedures) and asserted that his company's focus on "safe operations and risk management" would have prevented the oil spill.  He added that the Macondo well had "a lot of indications or problems ... going on for some period of time leading up to the final loss of control."  Senior executives of other companies voiced similar criticisms:  "[i]t certainly appears that not all the standards that we would recommend or that we would employ were in place," said John Watson, chairman of Chevron; "It's not a well that we would have drilled in that mechanical setup," said Marvin Odum, president of Shell.

70.     The Presidential Commission Report reached the same conclusion:  BP had no "comprehensive and systemic risk-analysis, peer-review, or management of change process" for a series of key decisions and the evidence did not show that "BP team members ... responsible for these decisions conducted any sort of formal analysis to assess the relative riskiness of available alternatives."  In connection

37

Certified Document Number: 52848615 - Page 37 of 54

with BP's Regional OSRP, the Presidential Commission described it as outright "embarrassing" as it "described biological resources nonexistent in the Gulf – including sea lions, sea otters, and walruses."

71.    Moreover, the Presidential Commission Report also noted that a survey conducted in March 2010 indicated that crew members working on the Deepwater Horizon feared retaliation. The survey, which included workers on the Deepwater Horizon and three other rigs, was conducted between March 12 and March 16, 2010 – *i.e.,* approximately one month prior to the Deepwater Horizon explosion.  According to the Presidential Commission, the survey found that: "Some 46 percent of crew members surveyed felt that some of the workforce feared reprisals for reporting unsafe situations, and 15 percent felt that there were not always enough people available to carry out work safely."

(a)    During the Relevant Period, BP engaged in continuous and systemic retaliation against employees who reported concerns about the safety and integrity of BP's operations.  By way of example, in August 2008, Kenneth Abbott ("Abbott"), a BP engineer working on design and blueprint management issues relating to the operations of BP's *Atlantis* rig (a major BP rig involved in drilling deepwater exploration and production wells in the Gulf of Mexico), raised concerns with BP managers about the Company's practices and policies for managing and updating designs and blueprints for its infrastructure and equipment on the *Atlantis*.  One particular concern was that designs for critical units on the rig were

Certified Document Number: 52848615 - Page 38 of 54

not updated to reflect changes made during repairs, maintenance, or other modifications. He was thereupon terminated.

(b) Even after Abbott was terminated in January 2009, he continued to raise his concerns to BP's Ombudsman office. On June 17, 2010, Abbott was invited to testify before Congress to describe the circumstances that led him to initially report his concerns to senior BP management. During his testimony, Abbott testified that he has "never seen another company with the kind of widespread disregard for proper engineering and safety procedures that I saw at BP...."

### The April 20 Explosion

72.   On April 20, 2010, after the markets closed, the Macondo well suffered a catastrophic – yet preventable – blowout, leading to a fatal explosion aboard the Deepwater Horizon killing 11 crew members and injuring many others. After attempts to stop the blowout failed, the surviving crew members abandoned ship, as the rig became engulfed in flames. Oil and gas spewed from the Macondo well onto the rig and into the Gulf of Mexico. Within two days of the explosion, the Deepwater Horizon rig sank, further damaging the riser that had connected the rig to the wellhead on the ocean floor.

### Post Explosion Misleading Statements

73.   Immediately following the Deepwater Horizon explosion, BP embarked on a "damage control" campaign intended to assure investors that the spill was minimal and manageable, and that BP was not at fault. In so doing, BP executives

Certified Document Number: 52848615 - Page 39 of 54

acted in reckless disregard of the truth, ignoring and concealing indications that the disaster was much larger than investors were being led to believe. Moreover, it was not until after the full extent of the leakage was disclosed that the Company acknowledged for the first time that it lacked the capacity to contain a major deep water spill.

### April 24 - 26, 2010

74.   On Saturday, April 24, 2010, while the unsuccessful attempts to activate the BOP continued, remotely operated vehicles ("ROVs") discovered additional leaks in the broken riser. Although officials had initially estimated that it would take the ROVs 24 to 36 hours to deploy the BOP, by Monday, April 26, 2010, oil continued to spew into the Gulf of Mexico. This news caused BP ordinary Shares to decline 12.90p per share or 2%, to close at 626.80p per share on April 26, 2010.  BP ordinary Shares declined an additional 16.80p per share or more than 2.6% on the next trading session, to close at 610p per share on April 27, 2010.

### The April 28 - 29, 2010 Statements

75.   On April 28, 2010, after the markets closed, Coast Guard leader Rear Admiral Landry announced during a joint press conference with BP that the National Oceanic and Atmospheric Administration ("NOAA") had increased its estimate of the oil flow rate from 1,000 to 5,000 barrels per day.

76.   During the joint press conference, Defendant Suttles again reiterated that BP's best estimate was that 1,000 barrels of oil per day were flowing from the Macondo well. In addition, Suttles stated, in part, as follows:

40

Certified Document Number: 5284861S - Page 40 of 54

Certified Document Number: 52848615 - Page 41 of 54

> Late this afternoon, while monitoring the blowout preventer area, which we have done continuously since the event began, we discovered a new point of leak. This leak is just beyond the top of the blowout preventer in the pipe work called the riser. Given the location, *we do not believe this changes the amount currently estimated to be released*.

77.    The following day, April 29, 2010, Department of Homeland Security Janet Napolitano announced that "today I will be designating that this is a spill of national significance."

78.    On the same day, April 29, 2010, Defendant Suttles conducted several media interviews to discuss the oil flow rate from the Macondo well.  For example, during an interview with The Early Show, Suttles stated, in part, as follows: "I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today." Suttles made a nearly identical false statement later in the day during an interview with The Today Show.

79.    On April 29, 2010, NOAA increased its estimate regarding the amount of oil that was spewing into the Gulf of Mexico from 1,000 to 5,000 barrels per day and the U.S. government declared the Macondo disaster a spill of national significance.

80.    On this news, BP ordinary shares declined 40.80p per share or more than 6.5%, to close at 584.2p per share on April 29, 2010.

81.    Although the price of BP securities fell in response to this news, the price of BP's securities were still artificially inflated due to the false and misleading statements made by Defendant Suttles on April 28 and 29, 2010.  Each of these statements was materially false and misleading when made, and was known by

41

Defendants to be false at that time, or was made with disregard for the truth because it falsely represented that the amount spilling from the Macondo well was between 1,000 and 5,000 barrels of oil per day.   In fact, the Company's "best estimate" of the amount of oil flowing from the well was more likely between 5,758 barrels per day and a high of 14,266 barrels per day – well above the amount claimed by Defendant Suttles. These figures were provided to BP's senior management in two internal BP document dated April 26, 2010 and April 27, 2010.

82.   In a hearing before the U.S. House of Representatives on May 26, 2010, Representative Edward Markey expressed outraged about Suttles' misrepresentations:

> Yesterday, BP provided me with an internal document dated April 27, 2010, and cited as BP Confidential that shows a low estimate, a best guess, and a high estimate of the amount of oil that was leaking. According to this BP document, the company's low estimate of the leak on April 27 [2010] was 1,063 barrels per day. ***Its best guess was 5,758 barrels per day. Its high estimate was 14,266 barrels per day.***
>
> ***
>
> BP has also turned over another document dated April 26 [, 2010] which includes a 5,000 barrel per day figure as well. ***So when BP was citing the 1,000-barrel per day figure to the American people on April 28th, their own internal documents from the day before show that their best guess was a leak of 5,768 barrels per day and their high estimate was more than 14,000 barrels*** that were spilling into the Gulf every day.

83.   It is not surprising that Defendants continuously misrepresented the known amounts of oil that were being released from the well.   Under the Clean Water Act, the company was liable for fines up to $4,300 for every barrel of oil spilled.

Certified Document Number: 52848615 - Page 42 of 54

**May 3, 2010**

84.     On May 3, 2010, after initially blaming Transocean and others for the Macondo well blowout and spill, BP admitted that it would pay for the spillage in the Gulf of Mexico.  More specifically, Defendant Hayward told NPR's Steve Inskeep that: "It is indeed BP's responsibility to deal with this, and we are dealing with it . . . . We will absolutely be paying for the cleanup operation.  There is no doubt about that.  It's our responsibility – we accept it fully." On this news, BP ordinary shares declined 17.00p or nearly 3%, to close at 558.50p per share on May 4, 2010.

**The May 5, 2010 Statement**

85.     Also on May 5, 2010, Defendant Hayward stated in an interview with journalists from the Houston Chronicle conducted at BP's Houston crisis center "the guesstimate remains 5,000 barrels a day."

**The May 18, 2010 Statement**

86.     On May 18, 2010, Hayward reiterated to the press in statements made in Houston that:

> I think the environmental impact of this disaster is likely to be very, very modest.  It is impossible to say and we will mount, as part of the aftermath, a very detailed environmental assessment as we go forward.... By everything we can see at the moment suggests that the overall environmental impact of this will be very, very modest.

87.     On May 24, 2010, BP announced that the costs for remediating the oil spill to date had more than doubled, from $350 million to $760 million.  In addition, the Company announced that it was capturing less oil than it expected.  Finally, pressure on BP continued to grow because the U.S. government threatened to take over the oil spill response effort because of BP's lack of progress.  On this news, BP

43

Certified Document Number: 52848615 - Page 43 of 54

ordinary shares declined 13.70p per share or nearly 3%, to close at 493p per share on May 24, 2010.

88.     The foregoing post-explosion statements were misleading:

(a)     Defendants failed to disclose that internal documents estimated leakage at 300% of the reported rate;

(b)     At no time during this period did BP officials disclose the most important fact – the Company lacked the ability to contain the spill.  As noted, Hayward subsequently acknowledged: "What is undoubtedly true is that we did not have the tools you would want in your tool box."  Rather, the Company assumed that the likelihood of an explosion and major spill was too remote to call for any serious contingency plans (despite the fact that over 38 blowouts had been recorded over a ten year span);

(c)     Although BP had a nominally designated "emergency plan," this was a "plan" in name only.  It had been prepared by a firm called Response Group and relied upon a third party vendor, Marine Spill Response Corporation, to provide equipment in case of a spill.  The Congressional Committee that reviewed the plan found that there was "no adequate response plan" to deal with a subsea blowout like Deepwater Horizon; and

(d)     The Congressional Committee's conclusions regarding BP's "plan" were well considered. Among other self-evident flaws were: (1) inclusion of a scientific wildlife expert who had died 4 years earlier;[1] (2) listing as "sensitive

---

[1] *Christian Science Monitor,* June 10, 2010.

Certified Document Number: 52848615 - Page 44 of 54

biological resources" walruses, sea otters, sea lions and seals, none of which are native to the Gulf of Mexico;[2] (3) listing the link for one of the "primary equipment providers for BP in the Gulf of Mexico Region [for] rapid deployment of spill response resources on a 24 hour, 7 days a week basis" as a Japanese home shopping network site; and (4) the absence of any information regarding currents, tides, prevailing winds, possible hurricanes or other oceanographic or meteorological conditions, even though such data are essential for effective oil spill response. As Public Employees for Environmental Responsibility Board Member Rick Steiner, a marine science professor and conservationist, pointed out, "[i]ncredibly, this voluminous document never once discusses how to stop a deep-water blowout, even though BP has significant deep-water operations in the Gulf. This response plan is not worth the paper it is written on."

### The Saturday May 29 – June 1, 2010 Revelations

89.    On Saturday, May 29, 2010, BP revealed that the "top kill" procedure it had begun a few days earlier had failed.  The failure of "top kill" indicated that BP would be unable to stop the oil spill and would have to rely on efforts to try to contain the spill while it completed the relief wells.  The failed attempt to kill the well by using the "top kill" and "junk shot" efforts shocked investors.  As noted by ABC News on Saturday, May 29, 2010: "We begin tonight with breaking news from the Gulf.  After so much talk that Top Kill was the best bet to plug the oil spill in the Gulf, BP announced just a short time ago that the effort has failed . . . . That

---

[2] *Id.*

Certified Document Number: 52848615 - Page 45 of 54

live picture so many Americans have been keeping track of [i.e., the oil spewing from the Macondo well], us included, confirms that the oil is still gushing into the Gulf. This is another crushing blow when it comes on what is now day 40 of this crisis."  Similarly, on that same day, the Agence France Presse reported, in part, that: "The announcement [that the top kill and junk short plans failed] is a stunning setback for efforts to halt what has become the worst oil spill in US history...."  Moreover, *The Business Insider* made clear that the failure of the top kill would lead to BP's securities being "slaughtered in London trading on Monday."

90.     On that same day, *The New York Times* published an article entitled "Documents Show Early Worries About Safety of Rig."  The article provided new evidence that:

> Internal documents from BP show that there were serious problems and safety concerns with the Deepwater Horizon rig *far earlier than those the company described to Congress last week.*
>
> ***
>
> The documents show that in March, after several weeks of problems on the rig, BP was struggling with a loss of "well control." *And as far back as 11 months ago, it was concerned about the well casing and the blowout preventer.*

91.     On Tuesday, June 1, 2010, minutes before the close of the U.S. market, U.S. Attorney General Eric Holder announced that the Department of Justice had opened formal criminal and civil probes into BP in response to the oil spill and its false assurances that it could stop the flow of oil.  On this news, BP ordinary shares declined 64.80p per share or more than 13%, to close at 430p per share on June 1, 2010.

46

Certified Document Number: 52848615 - Page 46 of 54

**June 2, 2010**

92.    On June 2, 2010, Defendant Hayward admitted that it is "an entirely fair criticism" to blame BP for the disorganized and poor cleanup effort because ***"[w]hat's undoubtedly true is that we did not have the tools you'd want in your tool kit"*** to stop the leak from the Macondo well in the Gulf of Mexico in the aftermath of the explosion.

**June 9, 2010**

93.    On June 9, 2010, fears that the Company would suspend dividends caused a further decline in BP securities.  An *Associated Press* Article published on the afternoon of June 9, 2010 entitled "Dividend Worries Weigh on BP Shares" explained, "Cutting the dividend would have a big impact in Britain, as BP accounts for around 12-13 percent of payments from companies in the blue-chip FTSE 100 index . . . ."  On this news, BP ordinary shares declined 17.35p per share or 4%, to close at 391.55p per share on June 9, 2010.  BP ordinary shares declined an additional 26.05p per share or nearly 7%, to close at 365.50p per share on June 10, 2010.

**June 14, 2010**

94.    Then, on June 14, 2010, BP's Board of Directors met to discuss suspending the Company's dividend payments in light of the Company's agreement to setup a $20 billion claim fund for damages caused by Deepwater Horizon catastrophe.  On that date, *The New York Times* reported, in part, as follows:

> To make sure that all claims are paid, the Obama administration has stepped up the pressure on the company, demanding that it set aside money to pay for future liabilities before paying dividends to

Certified Document Number: 52848615 - Page 47 of 54

shareholders, which now amount to about $10.5 billion annually. Senate Democrats are asking BP to set up a $20 billion cleanup fund. BP, which has spent about $1.5 billion on the cleanup so far, has said it expects to be able to pay all spill costs from its regular operating funds. ***But in response to the federal government's requests, BP's board met Monday to consider its options.*** A spokesman said the company did not expect to announce decisions about its dividend until after its chairman and its chief executive spoke with Mr. Obama on Wednesday at a meeting the president had called. ***A person with direct knowledge of the discussions said the board was considering three options: suspending payment of the dividend for two quarters, paying the dividend in bonus shares rather than cash, or placing an amount equal to the dividend payment in escrow while continuing to pay for the cleanup separately.***

95.     On this news, BP ordinary Shares declined 36.45p per share or more than 9%, to close at 355.45 per share on June 14, 2010. Indeed, according to another news source: "Shares in BP plunged again Monday [June 14, 2010] as the company's board discussed US demands that it suspend dividend payments until it pays for the cleanup of the Gulf oil spill."

## VI.    RELIANCE

96.     Plaintiff and/or its investment managers acting on Plaintiff's behalf, actually, reasonably and/or justifiably relied upon Defendants' misleading statements by, *inter alia*, (i) reading BP's SEC filings; (ii) reading analyst reports regarding BP; (iii) reading newspaper and hearing other media accounts regarding BP; and (iv) relying on the assumption that the price of BP shares reflected accurate and truthful information issued by or on behalf of the Company.

## VII.   THE CLAIMS ARE TIMELY

97.     These claims are filed within the applicable statute of limitations and/or are otherwise subject to tolling. The filing of the Texas Federal Action tolled

Certified Document Number: 52848615 - Page 48 of 54

the statute of limitations for all individual claims of class members, including state law claims.   Such tolling continued until February 13, 2012, when the Court dismissed all claims based on purchases of BP ordinary shares abroad.

## VIII.  CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Texas Common Law Fraud
### (Against All Defendants)

98.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

99.    Defendants made the foregoing false and/or misleading statements and/or failed to disclose or concealed information necessary to make such statements not misleading; which were material; with the intent and/or foreseeability that Plaintiff and investors would rely thereon; and upon which Plaintiff reasonably relied to its detriment.

100.   To the extent necessary for proof of this claim, Defendants knew or but for their egregious recklessness would have known that their statements and omissions were false and/or misleading at the time they were made.

101. Plaintiff  actually  and  justifiably  relied  on  Defendants' misrepresentations and/or omissions, to its detriment when it purchased BP shares.

102.  Plaintiff would not have acquired the BP shares had it known the truth about the matters alleged herein, at least not at the prices that they paid, which were inflated by Defendants' misconduct.

Certified Document Number: 52848615 - Page 49 of 54

103. As a result of Defendants' false and misleading statements and omissions, Plaintiff suffered monetary injury and punitive damages, the amount of which will be proved at trial.

## SECOND CAUSE OF ACTION

### Texas Common Law Aiding and Abetting Fraud
### (Against Aiding and Abetting Defendants)

104. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

105. The Aiding and Abetting Defendants provided BP with substantial assistance in perpetrating the fraud. They provided BP misinformation or concealed from it material facts that caused BP to issue materially misleading statements to the public and/or drafted, participated in the drafting, or had the opportunity to preview those misstatements. The Aiding and Abetting Defendants failed to prevent the issuance of the misleading materials.

106. As subsidiaries of BP, the Aiding and Abetting Defendants owed fiduciary duties of candor and care to BP investors. They knew, or but for their recklessness would have known, about the materially misleading challenged statements. Therefore, they knew of or recklessly disregarded the fraud perpetrated by BP.

107. As a direct and natural result of the fraud committed by BP, and the knowing and active participation by the Aiding and Abetting Defendants, Plaintiff suffered substantial economic injury and punitive damages in connection with its purchases of BP shares, the amount of which will be proved at trial.

Certified Document Number: 52848615 - Page 50 of 54

### THIRD CAUSE OF ACTION

### Texas Common Law Negligent Misrepresentation
### (Against All Defendants)

108. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein, except all allegations about intentional or reckless misconduct.

109. Defendants supplied false and materially misleading statements in the course of their business for the guidance of Plaintiff to purchase BP shares.

110. When Defendants made the materially misleading statements, they failed to exercise reasonable care or competence in obtaining or communicating the information.

111. Defendants made untrue statements of material facts or failed to disclose material facts which rendered their affirmative statements materially misleading.

112. Plaintiff justifiably relied on these statements when making its purchases of BP shares.

113. Had Defendants not made the false and misleading representations, Plaintiff would not have purchased BP shares, at least not at the artificially inflated prices that they paid.

114. When Plaintiff purchased BP shares, it did not know about the untrue and misleading nature of the statements alleged herein.

Certified Document Number: 52848615 - Page 51 of 54

115.    As a direct and proximate result of the negligent misrepresentations made by Defendants, Plaintiff incurred economic damages and punitive damages, the amount of which will be proved at trial.

### FOURTH CAUSE OF ACTION
### Texas State Statutory Fraud (TBCC 27.01)
### (Against All Defendants)

116.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

117.    Defendants made false representations of material facts to Plaintiff and investors. Such statements were made for the purpose of inducing Plaintiff to invest in BP shares.

118.    Plaintiff actually and justifiably relied upon such misstatements when purchasing BP shares.

119.    As a direct and proximate result of the misrepresentations made by Defendants, Plaintiff incurred economic damages and punitive damages, the amount of which will be proved at trial.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment in their favor and pray for relief as follows:

A.    An award in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained by Plaintiff as a result of Defendants' wrongdoing, in an amount to be proved at trial;

B.    An award in favor of Plaintiff against all Defendants, jointly and severally, for all punitive damages sustained by Plaintiff as a result of Defendants'

Certified Document Number: 52848615 - Page 52 of 54

wrongdoing, in an amount to be proved at trial;

C.     An award in favor of Plaintiff of the costs, expenses, and disbursements of this action, including any attorneys' and experts' fees, if applicable, together with pre- and post-judgment interest; and

D.     An award in favor of Plaintiff of any other relief as this Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

**ABRAHAM, WATKINS, NICHOLS,
SORRELS, AGOSTO & FRIEND**

By: _____
　　　　Sammy Ford IV
　　　　Federal Bar Number 950682
　　　　Texas Bar Number: 24061331
　　　　800 Commerce Street
　　　　Houston, Texas 77002
　　　　Telephone: (713) 222-7211
　　　　Facsimile: (713) 225-0827

**POMERANTZ HAUDEK
GROSSMAN & GROSS LLP**
Marc I. Gross
Jeremy A. Lieberman
Jason Cowart
100 Park Avenue, 26th Floor
New York, NY  10017
Telephone:  (212) 661-1100
Facsimile: (212) 661-8665

Certified Document Number: 52848615 - Page 53 of 54

**POMERANTZ HAUDEK
GROSSMAN & GROSS LLP**
Patrick V. Dahlstrom
Joshua B. Silverman
Leigh Smollar Handelman
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: 312-377-1181
Facsimile:  312-377-1184

*Attorneys for South Yorkshire Pensions
Authority*

Certified Document Number: 52848615 - Page 54 of 54



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this    August 7, 2012

Certified Document Number:        52848615

*Chris Daniel*

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**