UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: BP p.l.c. § | § | MDL No. 10-md-2185 |
| SECURITIES LITIGATION | § | |
| | § | |
| | § | |
| | § | |
| SOUTH YORKSHIRE PENSIONS | § | Civ. Act. No. 4:12-cv-2362 (cons.) |
| AUTHORITY et al. | § | |
| | § | |
| v. | § | |
| | § | HON. KEITH P. ELLISON |
| BP P.L.C. et al. | § | |
| | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendants' Amended Second Tranche Consolidated Motion to Dismiss. (Doc. Nos. 53, 59.)[1] Having reviewed the original motion (Doc. No. 27), the amended motion, Plaintiffs' response (Doc. Nos. 69, 75), Defendants' reply (Doc. Nos. 81, 82), all papers in support thereof, and having heard oral argument, the Court finds that Defendants' Amended Motion (Doc. Nos. 53, 59) must be **GRANTED IN PART** and **DENIED IN PART**. The Court hereby incorporates, as relevant, its reasoning articulated in the Memoranda and Orders issued this day in two related cases—*Avalon Holdings, Inc. et al. v. B.P. p.l.c. et al.* [12-cv-3715] (the "*Avalon Holdings* Opinion") and *Mondrian Global Equity Fund, L.P. et al. v. BP p.l.c. et al.* [12-cv-3621] (the "*Mondrian* Opinion"). The Court also separately addresses arguments raised in Defendants' Motion which were not implicated by the allegations and claims in *Avalon Holdings* or *Mondrian*.

---

[1] Unless otherwise indicated, all docket references are to 12-cv-2362.

I.   **SPECIFICS OF THIS ACTION**

   A.   **The parties**

Plaintiffs in *South Yorkshire Pensions Authority et al. v. BP p.l.c. et al.* are South Yorkshire Pensions Authority ("South Yorkshire"); Electricity Pensions Trustee Limited ("EPTL"); and Hadrian Trustees Limited in its capacity as Trustee of Shipbuilding Industries Pension Scheme ("SIPS"). South Yorkshire is a U.K. public pension fund; EPTL and SIPS are private pension funds in the U.K. (Doc. Nos. 20, 22 ("South Yorkshire Compl."), at ¶¶ 22-24.)

The "South Yorkshire Defendants" or "Defendants" consist of three corporate entities in the BP family of companies—BP p.l.c.; BP America, Inc.; and BP Exploration & Production, Inc.—as well as five individual defendants. BP p.l.c. ("BP" or the "Company") is a U.K. corporation. (South Yorkshire Compl. ¶ 25.) BP America, Inc. ("BP America") and BP Exploration & Production, Inc. ("BP E&P"), both wholly-owned subsidiaries of BP, are Delaware corporations with their principal places of business in Houston, Texas. (*Id.* ¶¶ 29-30.)

The individual defendants were directors and officers of one or more of the corporate defendants prior to and during the Deepwater Horizon spill.[2] They are Anthony B. Hayward, executive director from 2003 to November 2010 and Chief Executive Officer at BP from May 2007 to October 2010; Douglas Suttles, Chief Operating Officer for BP E&P from January 2009 to at least January 2011; Andrew Inglis, CEO of BP E&P and an executive director of the Company from February 2007 until October 2010; H. Lamar McKay, the Chairman and President of BP America since January 2009; and Robert Dudley, executive director of BP since April 2009 and its Group Chief Executive since October 2010 (i.e., Mr. Hayward's successor).

---

[2] The South Yorkshire Complaint also names Robert Malone and David Rainey as defendants, but they have been dismissed by stipulation of the parties. (Doc. No. 55 ("Conforming Stip."), at 4, 6.)

(South Yorkshire Compl. ¶¶ 32-34, 37-38.)

### B. The claims

The South Yorkshire Plaintiffs purchased BP Ordinary Shares on the London Stock Exchange between January 16, 2007 and June 25, 2010. (South Yorkshire Compl. ¶ 1.) They allege that Defendants made a series of misrepresentations regarding:

> (i) the extent of BP's commitment to a "safety first" approach to oil drilling . . .; (ii) the size of the oil spill that followed the April 20, 2010 explosion on one of BP's Gulf of Mexico . . . oil rigs . . . and BP's ability to contain the spill; and (iii) the extent of BP's likely responsibility for the catastrophe once it occurred.

(*Id*. ¶ 2.) They claim that, following the Deepwater Horizon explosion, the "truth [about BP] slowly emerged," causing BP stock to "plunge[] in value" and costing Plaintiffs "millions of dollars in losses." (*Id*. ¶ 17.) They assert English common law deceit and negligent misrepresentation claims against all defendants.[3] (*Id*. ¶¶ 551-57, 563-73; Doc. No. 55 ("Conforming Stip."), at 3.)

### C. Alleged misrepresentations not addressed in prior orders

In addition to misrepresentations previously addressed by the Court in the Class Action, the first tranche cases, *Avalon Holdings*, and *Mondrian*, the South Yorkshire Plaintiffs claim that they were misled by statements made directly to them or to their investment advisors in six meetings between February 2007 and March 2010. (South Yorkshire Compl. at ¶¶ 447-453.) Four meetings were attended by investment advisors of EPTL. (*Id*. ¶¶ 448-49, 451, 453.) South Yorkshire attended a fifth meeting. (*Id*. ¶ 450.) The last meeting was held with an investment advisor of SIPS. (*Id*. ¶ 452.) The specific representations and alleged omissions from these

---

[3] The South Yorkshire Complaint also asserts a common law aiding and abetting fraud claim and a statutory claim under Texas law, but these claims have been dismissed by stipulation of the parties. (Conforming Stip. at 3.)

3

meetings will be detailed below, in the Court's analysis.

## II. DEFENDANTS' MOTION TO DISMISS

Defendants seek dismissal of Plaintiffs' claims based on the alleged misstatements from the six private meetings with Plaintiffs or their investment advisors. According to Defendants, these alleged misstatements are either true statements not adequately alleged to be false by omission, or generalized positive statements that cannot be judged true or false. (Doc. Nos. 54, 60 ("Mot."), at 25; Doc. Nos. 54-3 and 60-3, at 1-3.) Defendants also argue that Plaintiffs have failed to adequately allege the statements were made with knowledge of their falsity. (Mot. at 29-31; Doc. Nos. 54-3 and 60-3, at 1-3.)

## III. ANALYSIS

In the Mondrian Opinion, the Court ruled that all negligent misstatement claims filed in Texas state or federal court are subject to Texas's two-year statute of limitations. The lawsuits which comprise this action were all filed in Texas state and federal court more than two years after the final misrepresentation included in the Complaint.[4] As a result, the Court will confine its analysis, below, to whether Plaintiffs have stated valid deceit claims based on the six new meetings with Plaintiffs or their advisors.

### A. Statements made to EPTL's investment advisors

During the relevant period, BP met on four occasions with the investment advisors of EPTL. The first two meetings—on February 8, 2007 and January 30, 2008—were attended by ███████████████████████████████████████. (South Yorkshire Compl. ¶¶ 448-49.) BP's Chairman, Peter Sutherland, and its Corporate Secretary, David Jackson, spoke on

---

[4] South Yorkshire, EPTL, and SIPS initially filed separate actions, but opted to consolidate their cases once all the actions were made part of MDL 2185. (Doc. No. 6.)

behalf of BP. (*Id.*) At the last two meetings—on October 15, 2008 and an unspecified date in March 2010—EPTL was represented by ████████████████████████████████████ (*Id.* ¶¶ 451, 453.) The individuals who spoke on behalf of BP at these latter meetings are not identified. (*Id.*)

### 1.     February 8, 2007

The work of the Baker Panel and the transition from the former CEO, Lord Browne, to the new CEO, Mr. Hayward, were prominent topics of discussion at the first meeting. Mr. Sutherland informed ████ that BP "accepted the [Baker Report] and would apply all the recommendations." (South Yorkshire ¶ 448.) He also represented that the Baker Report recommendations were reminiscent of action items which had emerged from BP's own internal investigation—particularly, "a new Operating Risk Committee [which had] been set up to bring about a new system of reporting to the board on process safety." (*Id.*) Plaintiffs have not adequately alleged that these statements were false when rendered.

Taking the statements in reverse, Plaintiffs have not alleged that BP did not in fact engage in its own investigation following the Texas City explosion; that BP did not develop its own action items; that these action items did not resemble the recommendations made by the Baker Panel; or that the Operating Risk Committee was inaccurately described. In short, nothing in the South Yorkshire Complaint undermines the truthfulness of Mr. Sutherland's representations regarding existing fact. Plaintiffs defend the actionability of these representations by referencing the Court's prior admonition that statements must be capable of being adjudged either true or false when made. (Doc. Nos. 69, 75 ("South Yorkshire Opp."), at 55.) It is not sufficient, however, that Mr. Sutherland's statements are capable of such an assessment. The Complaint must also provide factual allegations *which would support that the statements were*

*false*. It is on this metric that the claims fail.[5]

This leaves Mr. Sutherland's declaration that BP *would apply* the recommendations of the Baker Panel. In the Avalon Holdings Opinion, the Court encountered nearly identical, public statements issued by Lord Browne in August and October 2005. The Court concluded that the statements are not actionable as deceit because they are not alleged to have been insincerely made. The South Yorkshire Plaintiffs, too, have not adequately alleged that Mr. Sutherland, on February 8, 2007, lacked an honest belief that BP would enact the Baker Panel recommendations. Therefore, even if time proved Mr. Sutherland's prognostication false, it cannot support Plaintiffs' English law claims.

Plaintiffs also suggest that Mr. Sutherland's statements from the February 8th meeting were misleading because he failed to specify that BP "had no intention of implementing OMS at rigs or other operational sites that were not fully owned by BP." (South Yorkshire Compl. ¶ 454.) The Court has found such an omission relevant to statements which touted the expansive reach and consistent scope of BP's new Operating Management System ("OMS"). *See In re BP p.l.c. Sec. Litig.* ("*BP III*"), 922 F. Supp. 2d 600, 623-24 (S.D. Tex. 2013); *Alameda Cnty. Employees' Ret. Ass'n v. BP p.l.c.*, 2013 WL 6383968, at *23 (S.D. Tex. Dec. 5, 2013). But Mr. Sutherland's broad, generalized promise that BP would embrace the Baker Panel recommendations is too far removed from the specifics of OMS to make the alleged "omission" relevant. *See Alameda Cnty.*, 2013 WL 6383968, at *22 (finding statements "were [not] rendered misleading by the 'omissions' suggested by Plaintiffs" because the subject matter of the

---

[5] For example, Plaintiffs' briefing intimates that the "Operating Risk Committee" referenced in Mr. Sutherland's remarks had *not* been established as advertised. (South Yorkshire Opp. at 55.) However, the Complaint acknowledges that the Group Operating Risk Committee—or "GORC"—was operating at least as early as 2006, prior to this meeting with ▮▮▮▮ (South Yorkshire Compl. ¶ 32.)

6

statements was not "deeply intertwined" with the subject matter of the alleged omissions). The Court declines to graft the purported "omission" onto any statement even touching upon the work of the Baker Panel. A more direct link between the facts disclosed and the facts withheld is required. *See Peek v. Gurney* [1873] LR 6 HL 377 (recognizing an action for deceit if there is a "partial and fragmentary statement of facts" such that "the withholding of that which is not stated makes that which is stated absolutely false").

### 2.     January 30, 2008

Nearly a year later, on January 30, 2008, ▮▮▮▮ met again with Mr. Sutherland and Mr. Jackson. (South Yorkshire Compl. ¶ 449.) ▮▮▮▮ was informed that BP's "prior issues" were caused by poor integration of acquisitions under Lord Browne's leadership. (*Id.*) BP claimed that "its risk function had been strengthened," and indicated that it would "reduce[]" "complexity . . . by delayering." (*Id.*) Finally, BP did not retract or qualify any of its representations from February 8, 2007. (*Id.*)

The statement that BP's "risk function had been strengthened" is the sort of generalized, positive statement which the Court has dismissed in the past as incapable of being adjudged either true or false. *See In re BP p.l.c. Sec. Litig.* ("*BP I*"), 843 F. Supp. 2d 712, 757 (S.D. Tex. 2012) ("General statements about corporate 'progress' are 'too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision.'") (quoting *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005)); *Alameda Cnty.*, 2013 WL 6383968, at *25 (dismissing statements of a "generalized, aspirational character"). The statement that BP intended to reduce complexity by "delayering" its organization is a statement of future intent that has not been adequately alleged as insincerely made. Neither statement can support Plaintiffs'

fraud-based claims.

Plaintiffs' only remaining argument, then, is that Mr. Sutherland and Mr. Jackson failed to correct, retract, or qualify the statements made at the February 8th meeting, a year prior. (South Yorkshire Opp. at 56.) The Court has found that none of the February 8th statements has been adequately alleged as false. Plaintiffs' most colorable contention is that Mr. Sutherland's February 8, 2007 promise that BP *would* implement the Baker Panel recommendations had already proven false by January 30, 2008, and that, "[u]nder English law, a person who makes even a correct statement (*e.g.* about his intentions) that becomes incorrect over time before being acted upon, faces liability." (*Id.*) But the Complaint does not indicate that the Baker Report or the Panel recommendations was specifically featured in the January 30th conversation. Although Plaintiffs allege that "BP made additional representations and omissions about its purported actions to enhance process safety in alignment with the recommendations of the Baker Panel," this appears to be a *post hoc* characterization of the meeting. None of the specific topics of discussion identified in the Complaint involve the Baker Panel or the Baker Report. (South Yorkshire Compl. ¶ 449 (noting discussion of "BP's Board renewal," "the transition from Lord Browne to [Mr.] Hayward," "[poor] integrat[ion of BP's] prior acquisitions under Lord Browne," "[BP's] risk function," and plans to "reduce[]" "complexity . . . by de-layering").) Because none of the participants in the January 30th conversation is alleged to have invoked or referenced Mr. Sutherland's February 8th statement regarding BP's intent to embrace the work of the Baker Panel, Plaintiffs have not stated a viable deceit claim based on Defendants' purported failure to correct, retract, or qualify the statement.

### 3. October 15, 2008

Several months later, on October 15, 2008, BP met with ▆▆▆▆, another investment advisor working with EPTL. According to the Complaint, ▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (South Yorkshire Compl. ¶ 451.) At the October 15th meeting, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (*Id.* ¶ 451(a).) BP attempted to allay ▆▆▆▆'s concerns by citing improved statistics at Texas City regarding how safe Texas City employees felt while at work. (*Id.*) It acknowledged, however, that "contractors were its biggest risk to health and safety." (*Id.*) Plaintiffs do not suggest that BP misrepresented the self-reporting by Texas City employees. Nor do they take issue with the notion that contractors posed the greatest risk to BP's operations—a statement that actually mirrors their criticisms of the Deepwater Horizon disaster. Because neither of these statements is alleged to be false, they cannot serve as the basis for a deceit claim.

Also at the October 15th meeting, BP and ▆▆▆▆ engaged in detailed discussions regarding BP's progress on the Baker Panel recommendations, including OMS. (South Yorkshire Compl. ¶¶ 451(b)-(c).) Plaintiffs appropriately cite the Court's rulings in the Class Action and the first tranche cases, sustaining statements which represented that progress had been made against the roadmap provided by the Baker Report. (South Yorkshire Opp. at 57-58.) The Court has some doubts whether the discussions with ▆▆▆▆ on October 15th will ultimately prove viable. Specifically, it appears that the conversation dealt almost exclusively with BP's new auditing procedures and its reorganization efforts—areas of reform which have not been fruitful

9

for other plaintiffs alleging that BP misled investors.[6] *See BP I*, 843 F. Supp. 2d at 766-68; *In re BP p.l.c. Sec. Litig.* ("*BP II*"), 852 F. Supp. 2d 767, 806 (S.D. Tex. 2012). Moreover, the OMS-specific statement that "group wide minimum requirements [are] already in place" is similar to public statements which the Court has *not* sustained. *See BP III*, 922 F. Supp. 2d at 624 (dismissing claims based on statements which described OMS as a "blueprint for safety and all aspects of operations throughout BP" and as "common [and] group-wide"). Nonetheless, the Court has permitted much less detailed statements regarding BP's "progress" on the Baker Panel recommendations to survive Rule 12(b) motion practice. *See BP I*, 843 F. Supp. 2d at 757-59. Therefore, the Court finds that Plaintiffs have adequately alleged the falsity of BP's statements of progress at the October 15th meeting. Plaintiffs' failure to identify the specific individuals who represented BP are fatal to their deceit claims, however. The statements are actionable—at most—as negligent misstatement, and Plaintiffs' negligent misstatement claims are time-barred.

Finally, Plaintiffs complain of the representation that OMS would be rolled out "to the rest of its business" by the end of 2010. (South Yorkshire Compl. ¶ 451(b).) They allege that it was misleading for its failure to indicate that BP "had no intention of implementing OMS at rigs or other operational sites that were not fully owned by BP." (*Id*. ¶ 454.) The Court has sustained similar allegations of falsity in the Class Action. *See BP III*, 922 F. Supp. 2d at 634-35. As above, however, the failure to attribute the statement to a specific individual means that Plaintiffs may not pursue a deceit claim based on the statement.

---

[6] The South Yorkshire Complaint contains specific allegations regarding BP's decision to exclude certain assets from the Gulf of Mexico—including deepwater rigs such as the Deepwater Horizon—from the Safety & Operations audit function. (South Yorkshire Compl. ¶¶ 160-163.) This decision appears to have been made on or after July 31, 2009, and thus post-dates ▆▆▆▆'s October 15th meeting with "BP." The chronological incongruity calls into question both whether the October 15th representations were false, and whether they were made by someone with knowledge of, or reckless disregard for, their falsity.

4.      March 2010

███████ met again with BP in March 2010, immediately prior to the 2010 Annual General Meeting. (South Yorkshire Compl. ¶ 453.) The conversation focused on "a proposed deferred annual bonus plan." (*Id.*) "BP stated that if, over the three year performance period, there were to be a material deterioration in [specific] safety and environmental metrics, or major incidents revealing underlying weaknesses in safety and environment management, BP's directors would lose both deferred shares and matching shares." (*Id.*) ███████ claims that these detailed representations regarding the deferred annual bonus plan were misleading because BP omitted that it faced serious risks in the Gulf of Mexico "which if ever made manifest would clearly trigger the deferred annual bonus plan performance target clawback." (*Id.*) The Court disagrees with the articulated theory of how the March 2010 statements were false. The conversation dwelled on the mechanics of a specific program. BP was not required—by virtue of engaging in a discussion of the program—to delve into the myriad possible ways that the program could be triggered. Plaintiffs have not identified how BP's descriptions of the deferred annual bonus plan were misleading, and their claims based on this meeting must be dismissed.

B.      **Statements made to South Yorkshire**

On May 22, 2008, South Yorkshire attended a meeting with BP Investor Relations which is described as "a regional presentation by BP of its February 27, 2008 Strategy Presentation." (South Yorkshire Compl. ¶ 450.) Plaintiffs aver generally that the meeting involved discussion of "the safety of BP's operations and the steps BP was taking to improve safety in the wake of the Texas City incident and the issuance of the Baker Panel report." (*Id.*)

The Court has previously sustained alleged misrepresentations from the February 27, 2008 Strategy Presentation. Specifically, it held that plaintiffs in the Class Action had adequately

11

alleged that Mr. Hayward misrepresented BP's progress on the Baker Panel recommendations. *See BP I*, 843 F. Supp. 2d at 757-59, 782-84. Plaintiffs attempt to piggyback on these findings. But the failure to identify specific individuals who delivered BP's message at the May 22nd regional presentation is fatal to Plaintiffs' deceit claims, and Texas's statute of limitations bars their negligent misstatement claims. The Court will dismiss all claims based on the May 22nd investor meeting attended by South Yorkshire.

### C. Statements made to SIPS's investment advisor

███████████████████████████████████████████, an investment advisor working with SIPS, met with BP in Boston on September 24, 2009. Mr. Inglis attended the meeting and "discussed BP's production efforts in the Gulf of Mexico, noting several challenges, including depth, high pressure, and high temperature." He stated that the "biggest challenge was to get sustained productivity from the oil well." Plaintiffs claim that these statements were misleading because Mr. Inglis omitted "the risks of a potential blown well and oil spill at such depths, the impacts that BP's corner cutting on safety had in increasing such risks, and the fact that BP lacked the capability to adequately respond to a sizable drilling accident in the deepwater Gulf." (South Yorkshire Compl. ¶ 452.)

The South Yorkshire Complaint contains a number of specific references to Mr. Inglis's awareness of safety deficiencies within the BP's exploration and production business unit. (*E.g.*, South Yorkshire Compl. ¶¶ 166, 170, 172.) These include a reference to an email drafted by Mr. Inglis in July 2009, in which he notes that "contractor operated drilling rigs" are "fall[ing] short of BP expectations" regarding "Control of Work (CoW) practices." (*Id.* ¶ 172.) Notably, Mr. Inglis authored this email shortly before he met with ███████.

Despite this detail, Plaintiffs have failed to allege that Mr. Inglis's statements to ███

▆▆ were misleading, or that he himself did not believe them to be true. From the discussion depicted in the Complaint, Mr. Inglis addressed with ▆▆▆▆ the challenges BP faced in making a deepwater well productive and profitable. Plaintiffs apparently complain that Mr. Inglis did not also acknowledge another risk faced by BP: the risk of loss of well control. But the Court has noted that investors in BP were well aware of this risk. *See BP I*, 843 F. Supp. 2d at 762. Plaintiffs also fault Mr. Inglis for not mentioning the cost-cutting efforts within BP which had allegedly increased the risks of a deepwater blowout. The Court has rejected this argument before for "fail[ure] to connect BP's reorganization to specific safety failures." *Alameda Cnty.*, 2013 WL 6383968, at *24. Finally, as regards Mr. Inglis's purported failure to mention BP's inability to respond to a drilling accident in deepwater, the Complaint does not disclose that his conversation with ▆▆▆▆ fairly touched upon BP's disaster preparedness. And the Court does not find the topic so "deeply intertwined" with the subject matter of the conversation at hand that Mr. Inglis's failure to address it is actionable as deceit.[7] *See id*. at *22. Plaintiffs' claims based on the September 24, 2009 meeting with ▆▆▆▆ will be dismissed.

## IV.  CONCLUSION

For the foregoing reasons, and pursuant to the reasoning articulated in the *Avalon Holdings* Opinion and *Mondrian* Opinion, the Court **GRANTS** the Motion to Dismiss as to the following claims:

---

[7] Plaintiffs clearly believe that the "biggest risk" to BP's "production efforts in the Gulf of Mexico" in September 2009 was the fact that BP had no plans in place to deal with a loss of control in deepwater, and they take issue with Mr. Inglis's emphasis on the difficulty of making a well productive and his silence on BP's lack of disaster readiness. (Doc. Nos. 69, 75 ("South Yorkshire Opp."), at 58-59.) But the Court is mindful that fraud-based claims cannot be viewed through the lens of hindsight. The question it addresses above is whether Plaintiffs have adequately alleged that Mr. Inglis emphasized one challenge, and remained silent about the other, in a deliberate attempt to mislead ▆▆▆▆ and its clients, or with reckless disregard for whether it would be misleading. Plaintiffs have not made this showing.

- All negligent misstatement claims.

- All claims based on statements made in the February 8, 2007 meeting with ▮▮▮▮ (South Yorkshire Compl. ¶ 448.)

- All claims based on statements made in the January 30, 2008 meeting with ▮▮▮▮ (*Id*. ¶ 449.)

- All claims based on Mr. Inglis's statements made in the 2008 Strategy Presentation on February 27, 2008. (*Id*. ¶ 350(b).)

- All claims based on statements made in the May 22, 2008 regional presentation attended by South Yorkshire. (*Id*. ¶ 450.)

- All claims based on statements made in the October 15, 2008 meeting with ▮▮▮▮. (*Id*. ¶ 451(a)-(c).)

- All claims based on statements made in the September 24, 2009 meeting with ▮▮▮▮ (*Id*. ¶ 452.)

- All claims based on statements made in the March 2010 meeting with ▮▮▮▮ (*Id*. ¶ 453.)

- All claims based on statements made in the May 20, 2010 press release and Form 6-K. (*Id*. ¶ 432.)

- All claims based on statements made in the May 24, 2010 press release and Form 6-K. (*Id*. ¶ 439.)

In all other respects, the Motion is **DENIED.**

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the thirtieth day of September, 2014.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE